**UNITED STATES of America, Appellee,**

v.

**Hyman RAPPAPORT, Appellant.**

**No. 132, Docket 27331.**

United States Court of Appeals Second Circuit.

Argued Nov. 26, 1962.

Decided Jan. 22, 1963.

Frances T. Wolff, New York City, for appellant.

Joseph P. Hoey, U. S. Atty. for the Eastern District of New York (Philip Silverman, Asst. U. S. Atty., of counsel), for appellee.

Before CLARK, MOORE and KAUFMAN, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

The defendant, Hyman Rappaport, appeals from a judgment (upon a jury verdict) adjudging him guilty of having in his possession certain stock certificates "which had been stolen from an American Airlines Aircraft" transporting the certificates as part of an interstate shipment, the defendant knowing them to have been stolen (Indictment, Count Two). A conspiracy count (Count One) against Rappaport, Danta, Weinberg and Newman was dismissed at the end of the case. At the opening of the trial the Government moved "to sever as against the defendant Samuel J. Danta, also known as Joseph Pagano." Thereupon, an attorney for Pagano said, "On behalf of Joseph Pagano, I have no objection to the motion." The motion was granted and the trial proceeded against Rappaport, Weinberg and Newman. At the end of the Government's case, the trial court dismissed the conspiracy count (One) against all three and the possession count (Two) as against Weinberg and Newman. The case went to the jury against Rappaport only. Because the case presents certain troublesome aspects, the facts must be set forth at some length as a background for our conclusions.

On July 24, 1959 a stock brokerage firm in Los Angeles, California, delivered a package containing eight stock certificates to the Railway Express Agency for shipment by air to its (the brokerage firm's) New York office. The package was placed on the counter (air shipment section) of the Express Company's office. The records of the brokerage firm's New York office contained no entry of its receipt. No proof of actual theft was offered. The trial court, in denying the motion to dismiss at the end of the Government's case upon the ground, amongst others, that "there is no proof that these securities were stolen," ruled that in his opinion the mysterious disappearance "was stealing under the Act."

One year later, on July 22, 1960, Rappaport and Newman appeared at the State Bank of Long Beach, Long Beach, New York, where they were known (Rappaport for some twelve years) and discussed a loan ($3,000) for Rappaport on collateral. The collateral consisted of stock certificates in the name of "Sam J. Danta." The Bank required a hypothecation form executed by Danta. Stating that Danta was out of town, Rappaport left the certificates with the Bank. Upon return of the ostensible owner, Danta, apparently the loan plan changed and the certificates were repossessed by Rappaport. He returned to the Bank on July 26th with a signed hypothecation, and with instructions that the owner now wanted to sell them. One certificate with the name, Sam J. Danta, indistinctly written thereon, was left with the Bank so that it could establish negotiability. Informed that the Bank's brokers would sell all the certificates, Rappaport delivered them to the Bank. On August 16, 1960, Rappaport was advised by the Bank that it had received the proceeds of the sale, $27,797.60. He appeared at the Bank on the same day with a person whom he introduced as Danta. Danta opened an account in his name (address, Concourse Plaza Hotel, Bronx, New York), and deposited the proceeds. Danta then drew a check for $10,000 which he cashed and also drew a check

for $3,000 to Rappaport who deposited it in the Bank in his account.

Investigation proved that the certificates were identical with those delivered a year earlier in Los Angeles which had disappeared except that microfilms of the certificates taken before they were shipped on July 24, 1959 showed that the certificates were issued in the names of certain firms such as Bache & Co., Holt & Co., and Nay & Co. These names had been replaced by the name of Sam J. Danta.

A vice-president and the secretary of the Bank corroborated the facts regarding the bank transaction. As to ownership of the certificates, the vice-president testified that Rappaport on his first visit to the Bank said, "they weren't his" and that upon his reappearance on or about August 16th Rappaport introduced a man with him saying, "This is Mr. Danta." The secretary testified that on the August 16th appearance Rappaport said, "This is Mr. Danta, the gentleman who owned the stocks."

An F.B.I. agent testified as to a conversation with the defendant Newman who said he had accompanied Rappaport to the Bank on July 22, 1960 for the purpose of negotiating a loan, that a friend of Rappaport was willing to put up the securities as collateral and that he (Newman) did not know the certificates had been stolen. The court properly instructed the jury to "shut from your minds the evidence as against the defendant Rappaport because he is not concerned in this testimony." The testimony was taken over objection by Rappaport's counsel because as the court noted, "There is a conspiracy count here, Count 1." A conversation between the agent and Weinberg revealed that he had accompanied Rappaport to the Bank to sign some corporate papers in connection with a loan. Another F.B.I. agent told of a conversation with Rappaport who stated in greater detail the circumstances under which he had originally met Danta in Florida, his seeing him in New York and his belief that "Danta would be a person from whom he might obtain some money."

504

Rappaport told him that after they left the Bank and he couldn't subsequently locate Danta, he began to get suspicious that the stocks might be stolen.

The trial court was greatly influenced, in dismissing Count Two as against Newman and Weinberg, by the fact that they did not have physical possession of the certificates. The conspiracy count was dismissed but the testimony of Newman and Weinberg, theoretically excluded as against Rappaport and inconclusive as it was, had been heard by the jury. The certificates had mysteriously disappeared; they had mysteriously re-appeared a year later in Rappaport's possession—ergo, he was guilty of possessing them, knowing them to have been stolen. Little wonder the Government prosecutor said in his summation to the jury, "Now I want you to take a big step. I want you to take a very big step here. I want you to infer from that that somewhere between the time that Railway Express got their hands on the package and the time it was supposed to be delivered in New York, somebody stole it. Now, think of this, ladies and gentlemen. Any time a man would either sneak in under cover of night or for some other reason be undetected going into the Railway Express, or the airlines, or anywhere else, and pilfer a package and walk away, can the Government prove——." At this point Rappaport's counsel said quite correctly, "There is no evidence of this, your Honor" and the court said, "He is drawing his own inferences from what the evidence indicates and he has a right to do that."

It is all very well to tell the jury that they are not bound by what counsel or court may say and that it is their recollection of the evidence that counts but inferences cannot be built upon non-existent evidence. Even if the jury had taken the very biggest step of which it was capable across the chasm of uncertainty, it might not have reached the other side. Even if it inferred that "somebody stole it," that is not proof of Rappaport's knowledge of the theft.

Another disquieting feature has to do with Danta. Although much of the colloquy between court and counsel was not in the presence of the jury, nevertheless this court is entitled to look at the record as a whole. The incident started with an apparently harmless inquiry by Government counsel on direct: "Q. And do you know him under any other name besides Sam J. Danta?" There was an objection but the Government explained that "the identification of Mr. Danta is very important to the Government's case." What the mystery was is not revealed to us but the court said, "I asked them not to make remarks, and I am telling you not to make them * * * I don't want any reference to Mr. Danta any further. You have gone as far as you can go" (Deft. App. 79a). This court is not enlightened —but rather perplexed—by a further colloquy (not in the presence of the jury):

"The Court: But it all came out that Rappaport did not own the stock. It was in the name of Danta.

"Mr. Marcheso: And neither did Danta. We don't know who Danta is yet.

"The Court: You know and I know. Don't let us debate that point.

"Mr. Marcheso: That is a very important point, your Honor.

"The Court: Danta is in the indictment and yet you have not [seen] fit to go to trial with this man.

"Mr. Marcheso: Well, he was severed.

* * * * * *

"The Court: Well * * * you severed as against what I think is the most important defendant in this case, the man who got the twenty-seven thousand dollars." (Deft. App. 106a, 107a).

Danta's name came up again after the close of the trial when the Government sought (not in the presence of the jury) to reopen because of the exclusion of evidence concerning the identification of Danta.

"The Court: Now, Mr. Marcheso, if I were you I wouldn't touch on that because I might make a statement that I might be sorry for. And I might make a statement that you might be sorry for. Now, you and I know about Danta too. Now suppose we leave it where it is. I will tell you privately what I think you should have done, but I don't think I should tell you publicly." (Deft. App. 110a).

Whatever the secret may have been between court and prosecutor, this court admits to not possessing seven league boots so as to be able to take the "big step" to speculate about Danta and his effect, good or bad, upon the case.

The charge technically covered the essential ingredients of the crime but where, as here, the Government's case, of necessity, had to depend entirely on speculation and inference, query, whether this is enough. In a case made up of "if's" and "might have been's", the defendant was entitled to present for jury consideration his suggested theories. Possibly, the certificates had been taken by someone after the interstate transaction had ended, or been mislaid by the carrier. The year's lapse of time between the delivery of the certificates to the transportation agency and their reappearance in Rappaport's possession removes this case from the category of possession — immediately — after — disappearance cases. Furthermore, it was Danta—not Rappaport—who received the $27,000. If the jury was to speculate they might well have been asked to consider: would Rappaport have engaged in this transaction openly and at a bank where he was well known just to obtain a loan of $3,000? Rappaport may have been the arch-conspirator of the group but this question is not before us. The trial court did not so regard him and, hence, dismissed the conspiracy charges. This is a case, somewhat *sui generis*, in which this court feels that the interests of justice may be better served by remanding for a new trial in which possibly the Danta-Pagano mystery will be clarified or kept enshrouded as the trial strategies of respective counsel may determine to be in the best interest of their respective causes.

Reversed and remanded.