**UNITED STATES of America,
Appellee,**

v.

**Alfred BRAWER et al., Defendants-
Appellants.**

**Cal. Nos. 612–614, Dockets 72–2199,
72–2201, 72–2215.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1973.

Decided June 22, 1973.

Alfred I. Rosner, New York City, for defendants-appellants Alfred Brawer and Ralph Ignomirello.

Jay H. Topkis, New York City, (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, and Kenneth C. Bass, III, Washington, D. C., of counsel), for defendant-appellant Wassil Kreshik.

Jay S. Horowitz, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. of N. Y., John J. Kenney and Richard J. Davis, Asst. U. S. Attys., New York City, of counsel), for appellee United States.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Appellants Alfred Brawer, Ralph Ignomirello, and Wassil Kreshik appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a seven-day trial by jury before Judge Milton Pollack. The three-count indictment charged each appellant and one Salvatore L. Mauceli, a/k/a Steve Marsh (named only as a co-conspirator), with: (1) conspiracy to violate 18 U.S.C. §§ 2, 371, and 2314, by unlawfully, wilfully, and knowingly transporting stolen United States Treasury Bills in interstate and foreign commerce; (2) transportation of $262,000 of stolen Treasury Bills in foreign commerce between New York City and Zurich, Switzerland; and (3) transportation of said bills between New York City and Montreal, Canada. Appellants were found guilty as charged on all three counts.

At the close of the government's evidence, and again at the close of their respective cases, each appellant moved for a judgment of acquittal on all counts; the motions were denied. After the jury rendered its verdict each appellant moved for a new trial on the ground that the verdict was against the weight of the evidence; these motions were also denied.

Brawer was sentenced to a five-year term of imprisonment on Count 1 and to seven-year terms of imprisonment on Counts 2 and 3, the sentences to run concurrently. Ignomirello was sentenced

to a term of imprisonment of one year and a day on each count, the terms to run concurrently, with parole available after service of a term of two months, pursuant to 18 U.S.C. § 4208(a)(1). Kreshik was sentenced on Count 1 to a term of imprisonment of one year and a day, with parole available after service of a term of two months; as to Counts 2 and 3, imposition of sentence was suspended and he was placed on probation for a period of five years, to commence upon expiration of the term of imprisonment on Count 1.

## I. THE EVIDENCE

Since all three appellants question the sufficiency of the evidence upon which they were convicted, it is necessary to state the facts adduced at trial in some detail.

The narrative begins on March 6, 1969, the date on which the brokerage house of Francis I. duPont & Co. (duPont) received at its offices in New York City $342,000 in six-month United States Treasury Bills which had been issued that same day. The serial numbers of the Treasury Bills were entered on duPont's records and the securities were deposited in one of duPont's vaults. DuPont paid $331,035.48 for the Bills, an amount reflecting a three percent discount from face value. One month later, after a physical search of duPont's offices on April 7 or 8, 1969, the Bills were found to be missing.

At about the time duPont received the Bills, that is, during the first week of March, 1969, appellant Kreshik, an Orthodox Catholic priest with a parish in Bayonne, New Jersey, approached a long-time friend, banker, and lawyer named Edward Dembe, to ask his assistance in negotiating the sale of some securities. Kreshik told Dembe that an ailing parishioner wished to dispose of some government "bonds" and that for personal reasons the parishioner wished to sell without his partners knowing about it. The parishioner wanted to sell them abroad. At trial Dembe, a government witness, testified that on that oc-

casion Kreshik "told me that he had a parishioner whom he was trying to help, and this parishioner wanted to sell or dispose of some government bonds but he wanted to dispose of them outside of the country, and he wanted to know if I could direct him or help him introduce to someone [sic] or in some way help with this disposition of these bonds." (Trial Transcript, hereinafter "Tr.", at 65). Dembe warned Kreshik to be careful that the securities were not stolen; Kreshik assured Dembe that he was merely trying to help an ailing parishioner, that he knew the parishioner well, that the parishioner was trustworthy, and that the transaction was entirely legitimate (Tr. at 66–67). Of significance concerning this first of several meetings between Dembe and Kreshik was Dembe's trial testimony that Kreshik at each meeting had neglected or refused to divulge either the parishioner's name or the reason for selling the securities abroad on the ground that it was "like information he had gotten in the confessional." (Tr. at 66). This testimony conflicted with Kreshik's grand jury testimony (Kreshik did not testify at trial) in which he claimed that he *had* supplied Dembe with the parishioner's name, one Anthony Pirozzi,[1] stating "I have no reason to hide anything from anyone," (Tr. at 564) and that Pirozzi had never instructed him that the Bills had to be sold abroad. (Tr. at 564–65).[2] Kreshik

also testified at the grand jury that at no time had he asked parishioner Pirozzi where the latter had gotten the large number of securities in question. (Tr. at 564).

At a second meeting between Kreshik and Dembe, occurring approximately ten days after the first, Kreshik informed Dembe that the securities were not "bonds" but Treasury Bills. Dembe examined several of the Bills which Kreshik had brought him and determined that they were not counterfeit. After Kreshik repeatedly reiterated his parishioner's interest in selling the securities abroad, Dembe agreed to put Kreshik in contact with someone "who has some knowledge of securities in foreign markets." (Tr. at 76).[3] The "someone" Dembe had in mind was appellant Alfred Brawer, a man not known to Kreshik, but one whom Dembe knew as a customer of the bank and as one who also had had previous dealings in foreign securities. Brawer characterized himself as a "fiscal monetary expert as to foreign currency transactions and banking accounts normally in other countries." (Brawer Brief at 27).

Dembe arranged a meeting between Kreshik and Brawer for some time in late March or early April, at Kreshik's parish in Bayonne. Dembe introduced Brawer as "the gentleman that will be able to take care of the securities" (Tr.

1. Pirozzi, who was in the trucking business, was known to both Kreshik and Dembe, although the latter testified that he did not know of Pirozzi's involvement in the deal until after Mauceli had been arrested. Pirozzi, a Bayonne resident, had been a party to various business transactions at Dembe's bank, but was not known in the community as one who dealt in large quantities of government securities. Pirozzi in fact did suffer from a heart condition at the time Kreshik approached Dembe in March of 1969, and he died shortly thereafter.

2. There were several inconsistencies between Dembe's trial testimony and Kreshik's grand jury testimony. In addition to those cited in the text were the following disparities: Kreshik testified that he had met with Dembe only twice during the

span of one week to discuss the sale of the securities (Tr. at 563), while Dembe testified that they had met four times over a span of several weeks; Dembe testified that he had asked to see a few of the Bills as a sample and that Kreshik had shown him several, while Kreshik testified that he had not handled or looked at individual securities, delivering only an envelope containing the entire quantity to Dembe (Tr. at 563).

3. Dembe testified that although he continued to voice concern at the second meeting regarding the possibility that the securities were stolen, he was willing to assist Kreshik because of their long acquaintance, and because Kreshik had assured him that the transaction was legitimate (Tr. at 92–93).

at 561) and then apparently departed the scene, with no further participation in the ensuing events.[4]

As a result of the meeting at the parish Kreshik went to Pirozzi's home, picked up a package containing the Treasury Bills, and delivered them to Brawer the following morning. Appellant Kreshik contends that his involvement in the transaction, which he characterized as an innocent attempt to help an ailing parishioner who wanted to sell the securities anonymously so that his business partners would not know of it, ended with delivery of the bills to Brawer, and that he had absolutely no involvement in, or knowledge of, the events following. (Kreshik Brief at 4). The record tends to support Kreshik's contention, since the testimony of none of the witnesses at trial connected him with the subsequent actions of appellants Brawer, Ignomirello and co-conspirator Mauceli.[5] Mauceli, a government witness, testified that he never knew or even saw Kreshik. (Tr. at 124–25). Dembe testified that after Mauceli's arrest, "Father Kreshik was just as shocked as I was" and that Kreshik indicated he was going to see his ailing parishioner. (Tr. at 118).

On April 9, 1969, approximately one week after he first discussed the Treasury Bills with Kreshik, Brawer telephoned Mauceli, a photographer who lived in Teaneck, New Jersey, with whom Brawer "had had other big finan-

cial transactions." (Brawer Brief at 29). Brawer told Mauceli that "I finally got something with which we can make some money" (Tr. at 130), explaining that he had received a large quantity of Treasury Bills from a priest who, in turn, had obtained them from a parishioner who wanted to sell the Bills abroad because of "tax considerations." (Tr. at 130–31). Brawer assured Mauceli that the Bills were not stolen or tainted in any way, stating, "Would a priest get involved in stolen items?" (Tr. at 131). Brawer knew that Mauceli had foreign contacts who might be interested in buying the securities and asked him if he would help negotiate a sale abroad. Mauceli said he could telephone a Canadian contact, one Jacques Riel, immediately. Brawer agreed to the idea. (Tr. at 133). Mauceli testified at trial that Brawer had outlined explicit conditions for the sale of the securities: (1) the Bills had to be sold abroad (Tr. at 135); (2) the Bills should be sold at "90 percent of face value, and if that proved difficult to ask for 85 percent of face value" (Tr. at 131); (3) Brawer and Mauceli would share equally 10% of the sale price as their "commission" (Tr. at 150); (4) the sale "was supposed to be and had to be a cash deal" (Tr. at 144); (5) the securities had to be sold as quickly as possible—"within two days at the most" (Tr. at 178); and (6) the identity of the priest had to be kept secret, for "tax reasons" [6] (Tr. at 139). Mauceli quick-

---

4. Dembe testified that he subsequently did see each of the two men, separately, at his bank and was told by each that the transaction was about to be completed (Tr. at 81, 82). Dembe further testified that several weeks thereafter he saw both Kreshik and Brawer, after Mauceli's arrest, and that it was then that he first heard that Pirozzi was the unidentified parishioner.

5. Prior to trial Mauceli pleaded guilty to a charge of conspiring to transport the stolen securities and at trial testified as a government witness, as did Dembe. After trial Mauceli was sentenced to a six-month term of imprisonment, which was sus-

pended; he was placed on probation for two years.

6. It should be noted that the government's case as regards the attempts to sell the securities relied almost entirely on the testimony of Mauceli, and that appellants Brawer and Ignomirello disputed at trial, as they do here on appeal, that Mauceli was ever instructed to sell the Bills at 85% or 65% of face value. As will be discussed *infra*, Mauceli's testimony on the question of the discount sale price was most damaging to appellants on the issue of guilty knowledge that the Bills were stolen, and this testimony has a bearing on appellant's argument on appeal that

ly telephoned the Canadian, Riel, and made arrangements to fly to Montreal in two days' time, that is, on Friday, April 11th. Brawer would meet Mauceli at LaGuardia Airport and give him the $262,000 worth of Bills for the trip to Montreal.

On Friday, April 11th, the two met at the airport, as scheduled. Brawer had asked a friend, appellant Ralph Ignomirello, to accompany Mauceli on the trip to Montreal "just in case something happened because these were bearer instruments and * * * could be stolen * * * and whoever had possession of them could easily sell them." (Tr. at 142).[7] According to Mauceli's trial testimony, Mauceli again asked Brawer if the securities were legitimate; Brawer assured him they were, stating, "You can take them to any bank and check them against any stolen securities list and you will find that they are not stolen. * * * But I can't say what might show up three, four, five, six months from now." (Tr. 143–44). While Ignomirello was purchasing his plane ticket, and out of earshot, Brawer also informed Mauceli that if this deal went well, "[T]here was an additional $500,000 worth of Treasury Bills that we could sell later." (Tr. at 144).

In Montreal, Mauceli, using the name "Steve Marsh", and Ignomirello met with Jacques Riel, Mauceli's contact. After being informed of the facts surrounding the Treasury Bills, Riel asked Mauceli who Ignomirello was. Mauceli answered that he "represented the interests of the priest," to which Ignomirello remarked, "Yes, that's true." (Tr. at 149). Riel agreed to help Mauceli sell the securities to Canadian buyers, taking as his commission between one and three percent of the face value of the Bills. Riel took the two travellers to the offices of the North American Express Monorail Company, Ltd., where two officers of that company, Joseph Welsch and Frank Bubic, indicated an interest in the securities. Welsch, however, first wanted to know the serial numbers of the Bills so that he could have his bank check to see whether the Bills were stolen. (Tr. 153). Ignomirello produced the securities; Welsch copied the numbers. Near the close of this meeting, Welsch and Bubic asked whether Mauceli had any other securities to sell; Ignomirello nodded a signal to Mauceli. The latter then indicated that there might be an additional $500,000 worth of Treasury Bills available for sale, and that they could be bought for 85% of the face value.[8] The Canadians expressed interest in purchasing this large quantity of bills as well. (Tr. at 155). The meeting ended with the understanding that Mauceli and Ignomirello would return to New York City and that Mauceli would telephone Welsch and Bubic on the following Monday, April 14th, to confirm the sale. On the way to the airport Ignomirello warned Mauceli that Brawer would be angry because the deal

the prosecuting Assistant U.S. Attorney, Jay S. Horowitz, suppressed exculpatory evidence tending to refute Mauceli's testimony. See discussion of the suppression of evidence argument in Part V, *infra*. There was no direct evidence adduced at trial that Kreshik knew of the 90%, 85%, or 65% discount figures Mauceli had offered to the would-be Canadian buyers of the securities.

7. Mauceli learned for the first time at the airport that Ignomirello would accompany him on the trip. The two men knew each other, having met at Brawer's house on several occasions, but they did not know each other very well; Ignomirello

was Brawer's trusted friend. Ignomirello told Mauceli during the trip to Canada that all Brawer had told him about the securities was that they had come from a priest and that Brawer wanted him to accompany Mauceli on the trip to Montreal. (Tr. at 161).

8. Mauceli testified that Ignomirello had not been present at the airport when Brawer discussed the additional $500,000 worth of securities with Mauceli. Ignomirello's nodding signal to Mauceli thus gave rise to the inference that Brawer had informed Ignomirello of the additional securities on a prior occasion.

had not been consummated the same day, as per his instructions.

Ignomirello had spoken with clairvoyance. When the two met Brawer at his home that evening, Brawer was indeed angry, criticizing Mauceli for "leaving [the serial] numbers floating around Canada" and for bungling the deal. (Tr. at 163). Brawer then asked Mauceli if he knew anyone in Switzerland (where Brawer had a bank account) who might be interested in purchasing the Bills. Mauceli answered that he did not, but that a friend of his, one Bill Zylka, did have a contact in Zurich who might be interested in negotiating a sale. Brawer directed Mauceli to call Zylka, but instructed him not to mention Brawer's involvement. (Tr. at 165). Mauceli met with Zylka the next day, Saturday, April 12th, and made arrangements to fly to Switzerland on Monday, April 14th.

Mauceli's trip to Switzerland was unproductive. Zylka's Swiss contact was unwilling to agree to the terms of sale: Mauceli wanted to sell within two days' time as per Brawer's orders; the Swiss contact insisted on ten days. The deal fell through. Mauceli flew back to New York City that same day, April 15th, 1969, where he was met by Brawer at the airport. Brawer was not pleased with Mauceli's efforts, again admonishing him for "showing these bills and the [serial] numbers all over the world, and we might have some problems because of that." (Tr. at 178).

At the airport Mauceli offered to, and did, call the Canadians to see if they still were interested in the securities. They indicated that they were interested, and arranged for Bubic to fly to New York City the next day to meet with Mauceli. The two did meet the next day, April 16th, and they proceeded to the Wall Street area. They went to the Canadian Imperial Bank of Commerce where they deposited the Bills. Bubic told a bank official that the Bills had come from his attorney in Montreal and that they were to be used as a good-faith deposit on a $2 million contract in which his company was involved. The Bills so deposited, Mauceli and Bubic flew to Montreal, where the deal was to be consummated the next day. That evening Mauceli telephoned Brawer to inform him of the developments. Brawer told Mauceli that Canadian money would be acceptable, and instructed him to take a circuitous route back to New York City after completing the deal. (Tr. at 190–91).

The next day visited new problems on Mauceli's odyssey, however. The Canadian bank with which Bubic and Welsch were dealing insisted on proof of ownership of the Bills. (Tr. at 192–93). Mauceli telephoned Brawer again long distance. According to Mauceli, Brawer suggested that Mauceli represent himself as the owner, and that he sign an affidavit so indicating. The bank wouldn't accept the affidavit. (Id.) Mauceli called Brawer again. The substance of his conversation was hotly contested at trial, for reasons that become evident.[9] Mauceli testified that in this second telephone conversation, Brawer had said to him: "Well, if they will do the deal today, see if they will accept [the securities] for 65 percent of face value, but they must do the deal today." (Tr. at 193).[10] This offer was also re-

---

9. See note 6 *supra*.

10. The government supported Mauceli's testimony regarding the 65% discount price with Government Exhibit 17, a slip of paper found on Mauceli at his arrest. The barely legible inscriptions on the paper, testified Mauceli, were numerical computations made contemporaneously with Brawer's directions to sell the Bills at 65% of face, and showing what Mauceli figured to derive as his commission at that price. (Tr. at 577–80). The government did not call the would-be Canadian buyers, Bubic and Welsch, as witnesses at trial to testify on the question of the discount price offered by Mauceli, or on the question whether, as Mauceli had testified, Mauceli had attempted to represent himself as the true owner on the instructions of Brawer, on the ground that the government did not "have subpoena power

jected and the deal fell through. Welsch agreed to fly to New York City with Mauceli to retrieve the securities from the Canadian Imperial Bank of Commerce.

Arriving in New York, Mauceli telephoned Brawer from the airport. He expressed trepidation with having to retrieve the securities from the bank and again asked Brawer if the Bills had been stolen. Brawer responded, "How the hell do I know? I don't know where the bills originally came from." Brawer added, "Don't run now because if you run now, you are going to look guilty as sin. You went this far, go all the way." (Tr. at 194–95). The telephone call completed, Mauceli and Welsch proceeded to the Canadian Imperial Bank of Commerce to retrieve the Bills. Awaiting their arrival were special agents of the FBI, who promptly arrested the two men.

Approximately two weeks after his arrest, Mauceli testified at trial, he met with Brawer at the latter's home. Mauceli noticed bruises on Brawer's head; Brawer explained that he had been beaten by unknown persons, stating that he "was in trouble of being physically harmed and so was [Mauceli] because certain people who were known to be tough people think we doublecrossed them, that we sold the securities and pocketed the money." (Tr. at 422). Brawer told Mauceli "to keep [his] mouth shut, to stand trial alone, * * * [and] never take the stand and reveal where [he] got these securities, otherwise [he] definitely would be harmed." (Tr. at 423).[11] In the weeks that followed and prior to the time appellants were arrested, Brawer and Mauceli met numerous times, with Brawer reiterating his advice, and telling Mauceli that he would be "rewarded" later on for taking the blame. (Tr. at 425). Brawer indicated that he, unfortunately,

could not come forward and reveal where the Bills had come from "because of the people involved." (Tr. at 426). At one point Brawer purportedly assisted Mauceli in preparing a false typewritten version of the facts to present to Mauceli's counsel (*Id.*).

Mauceli decided to plead guilty, however. At a meeting held some two and one-half weeks before trial at the home of Mrs. Pirozzi, widow of the ailing parishioner from whom appellant Kreshik had obtained the Treasury Bills, Brawer tried to persuade Mauceli to change his guilty plea so that "we could present a united front at a trial." (Tr. at 573). Kreshik was not present at this meeting. Brawer offered to enlist the services of a psychiatrist, who would testify that because of his mental health Mauceli had not known what he was doing when he pleaded guilty, as well as to pay for Mauceli's attorney's fees if he stood trial; mention of a "reward" to Mauceli for following orders was again made at this meeting. (Tr. at 573–74). Although Mauceli, purportedly out of fear, agreed at the close of the meeting to change his guilty plea, he subsequently declined to do so, and testified against Brawer and Ignomirello at trial.

## II. SUFFICIENCY OF EVIDENCE OF GUILTY KNOWLEDGE

All three appellants attack their convictions on the ground of insufficiency of the evidence to show that they had known that they were dealing with stolen securities. Appellant Kreshik argues, *inter alia,* (Brief at 10) that the trial court erred in denying his motion for a judgment of acquittal, and in submitting his case to the jury, since there was "not enough evidence for any reasonable man to believe, 'beyond a reasonable doubt,'" that he actually knew the Bills were stolen, citing United States v. Taylor, 464 F.2d 240 (2d Cir. 1972).

over them." (Tr. at 1021). One of the Canadians, however, had voluntarily appeared before the grand jury and, presumably, would have appeared at trial as well if asked. Appellants' objections to the admission into evidence of Gov.Exh. 17 will be discussed *infra.*

11. Brawer denied ever making any of the foregoing statements to Mauceli.

Kreshik argues that the court may have erred by incorrectly applying the sufficiency of the evidence standard set forth in United States v. Feinberg, 140 F.2d 592 (2d Cir.), cert. denied, 322 U.S. 726–727, 64 S.Ct. 943, 88 L.Ed. 1562 (1944), rather than the more exacting standard established by this Court when we overruled *Feinberg* in United States v. Taylor, *supra*, and in submitting this case to the jury. Kreshik further argues that on appeal he is entitled to have the validity of the trial court's denial of his motion for acquittal measured solely in the light of the evidence presented by the government against him, apart from the evidence offered against, and by, his co-defendants Brawer and Ignomirello, who were represented separately at trial. United States v. Carneglia, 468 F.2d 1084, 1087 n. 4 (2d Cir. 1972); Cephus v. United States, 117 U.S.App.D.C. 15, 324 F.2d 893 (1963).

Brawer and Ignomirello, on appeal as at trial jointly represented by the same counsel, echo Kreshik's argument on the sufficiency of the evidence question, namely, that the evidence was insufficient to establish their guilt beyond a reasonable doubt and that it failed to prove that they *actually knew* the Bills they were attempting to sell were stolen, citing *Taylor, supra.* Ignomirello argues in addition that the trial court erred in instructing the jury on the definition of a co-conspirator and in his response to a jury inquiry on this point,[12] and that, in any event, the evidence was insufficient to establish his role as a co-conspirator and his case should not have gone to the jury.

Appellants' claim of insufficiency of the evidence to prove guilty knowledge, although a close question as regards Kreshik, is rejected. On appeal the evidence in the record must be viewed in the light most favorable to the Government. United States v. Tortorello, 480 F.2d 764 (2d Cir., 1973); United States v. D'Avanzo, 443 F.2d 1224, 1225 (2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971). Considering the evidence as to each appellant in its entirety, United States v. Wisniewski, 478 F.2d 274, 279 (2d Cir., 1973); United States v. Bottone, 365 F.2d 389, 392 (2d Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966), we are of the opinion that the evidence was sufficient to support the conclusion that Kreshik, Brawer, Ignomirello and Mauceli were each active participants in the scheme to sell $262,000 worth of stolen Treasury Bills. Our analysis of the evidence begins but does not end with reference to the rule of law early established by the Supreme Court in Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896), a principle we have often applied:

> Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence.

*See, e. g.,* United States v. Jacobs, 475 F.2d 270, 280 (2d Cir., 1973); United States v. DeSisto, 329 F.2d 929, 935 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964); United States v. Izzi, 427 F.2d 293, 297 (2d Cir.), cert. denied, 399 U.S. 928, 90 S.Ct. 2244, 26 L.Ed.2d 794 (1970). And although appellants argue that they can meet the rule of *Wilson, supra*, by pointing to evidence consistent with their innocence on the question of guilty knowledge, we think the government introduced substantial evidence to rebut defendants' efforts to demonstrate innocent possession.[13]

---

12. See discussion of alleged trial court errors with respect to the jury instructions, Part III, *infra*.

13. We note at this point that our review of the evidence must be read subject to our discussion of the *Brady* issue raised by appellants' charge, discussed *infra* at Part V, that the government may be guilty of prosecutorial misconduct in suppressing, or neglecting to disclose to

As we have noted, the evidence on guilty knowledge as to Kreshik presents a close question but one which ultimately must be resolved against ·him. We start with a visit in early March 1969 by Kreshik, a priest of the Orthodox Catholic faith, to Edward Dembe, a banker and lawyer. According to Kreshik, his purpose in approaching Dembe was to help minister to the needs of a dying parishioner, Anthony Pirozzi, who wanted to sell, in a surreptitious manner, some $262,000 worth of securities. Dembe, a long-time friend of Kreshik and banker to the latter's parish, on more than one occasion warned the priest that the Bills might be stolen. The Bills were, in fact, stolen at about that time from a Wall Street brokerage house; inexplicably they found their way into the hands of Pirozzi, who was in the trucking business. The testimony of Kreshik's long-time friend, Dembe, gave rise to circumstantial evidence most injurious to Kreshik. Dembe testified, for example, that despite his warnings about stolen Bills, Kreshik continued to refuse to name the ailing parishioner for whom he was acting and to stipulate that the Bills had to be sold abroad. Even accepting the fact that Kreshik was not knowledgeable about Treasury Bills and their easy negotiability, and that such Bills, especially in the quantity here involved, can be, and often are, involved in illicit transfer; and even accepting his argument that, as a priest, he had complete faith in Pirozzi's honesty, Kreshik's actions in this affair cast serious doubt on his claim of innocence. The jury was entitled to consider the question whether a reasonably cautious man, even a very trusting man such as Kreshik professed to be, would not have inquired of the source of the bills, allegedly Pirozzi, as to whether the Bills were legitimate. And yet, Kreshik testified before the grand jury that at no time did he ask Pirozzi where he had gotten the securities (Tr. at 564), nor, unknowledgeable as he was about securities, was he surprised that Pirozzi would want to sell over a quarter million dollars worth of securities in such questionable fashion (*id.*).

Upon his decision that the bills were not counterfeit, and wanting to help an old friend and clergyman who assured him of the legitimacy of the deal, Dembe concluded that he would put Kreshik in touch with Brawer. All defendants, including Kreshik, place great reliance upon Dembe's decision to introduce Kreshik to Brawer. They argue that if Dembe, an experienced banker and lawyer, would decide to involve himself in these proceedings, and he was not indicted, *a fortiori*, how can they be guilty when acting in reliance on Dembe's judgment? The answer is that, although Dembe himself should have known better than to involve himself in such a sale of mysteriously derived securities since, as a banker, he should have known that institutions, and not individuals, typically trade in such large quantities, the totality of his actions, unlike those of the appellants, falls short of complicity in a scheme in which the others, by *their* actions, demonstrated guilty knowledge of the true nature of the securities. Throughout the various attempts to sell the Bills, at a sale price ranging from 90% to 65% of face value, none of the appellants, oddly enough, apparently ever bothered to obtain, or inquire about, a bill of sale or affidavit of ownership from the true owner of the Bills. Mauceli testified that Brawer had wanted Mauceli to pose as the true owner. Parenthetically, the question arises why Brawer did not request of Kreshik that the latter obtain proof of ownership from his ailing parishioner prior to attempting to sell the Bills. It would ap-

---

appellants, evidence allegedly exculpatory which they could have used to impeach the testimony of Mauceli, a key government witness whose testimony in large part formed the basis of defendants' convictions. Reserving discussion of the suppression of evidence issue for Part V, *infra*, we now proceed with a review of the evidence properly before the trial court and the jury at the time motions for acquittal were made.

pear that Brawer, if he did not in fact suspect that the Bills were "hot," did not care to find out—preferring to rely on ignorance of the truth as a shield. There was also evidence that Brawer was uncomfortable with the fact that Mauceli was leaving the serial numbers of the Bills with potentially interested purchasers—such discomfort does not normally attach to a legitimate transaction, unless the parties suspect that an inquiry using the serial numbers might lead to the discovery that the Bills were either counterfeit or stolen. Whenever questions were raised regarding the legitimacy of the Bills, rather than seeking to obtain proof positive from the true owner that the Bills were not stolen, the defendants were content with the information that Kreshik, a clergyman, was involved, as though this fact alone assured regularity of the transaction.

The jury could reasonably conclude, from all the facts available to Kreshik, that his guilty knowledge could be established by the fact that he deliberately had closed his eyes to avoid knowing whether or not he was committing an unlawful act, *see* United States v. Jacobs, supra, 475 F.2d at 287; *cf.* United States v. Benjamin, 328 F.2d 854, 862–863 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964); or by the fact that he had acted with reckless disregard of whether the Bills were stolen and with a conscious purpose of avoiding learning the truth, *see Benjamin, supra,* 328 F.2d at 862.

■ On appeal Kreshik argues that the trial court, in ruling on his motion for directed judgment of acquittal, did not make clear whether he was applying the test of sufficiency set down in *Feinberg, supra,* or that recently adopted by this Court in *Taylor, supra,* overruling *Feinberg.* Kreshik argues that the decision in *Taylor* was filed on Thursday, July 6, 1972, and that the trial court below denied Kreshik's motion on Monday, July 10, 1972, four days later. The court's failure to indicate which test it was applying, argues Kreshik, evidences error since the evidence is not sufficient

to meet the *Taylor* standard, and, therefore, had the court applied *Taylor,* he would have granted the motion of acquittal. Whether measured by the test of *Feinberg* or that of *Taylor,* however, we think that the trial court properly denied the motion and properly submitted Kreshik's case to the jury. In *Taylor* we held that a standard stricter than that in *Feinberg* must be applied by a trial court when ruling on a motion for acquittal for insufficiency of the evidence in a criminal trial, and that the court's inquiry should be

> whether the reasonable mind of a juror could draw such an inference from [the evidence] so that he "might fairly conclude guilt beyond a reasonable doubt." 464 F.2d at 244–245.

Even though the record does not indicate whether the trial court applied *Taylor,* the government's circumstantial evidence against Kreshik, as recited above, under *Taylor* warranted submission to the jury. Kreshik's reliance by analogy on our decision in United States v. Rappaport, 312 F.2d 502 (2d Cir. 1963), is misplaced since the facts of that case are distinguishable in material respects from those before us.

The evidence supporting the inference of guilty knowledge established by the *Wilson* case, *supra,* 162 U.S. at 619, 16 S.Ct. 895, 40 L.Ed. 1090, was, we think, even stronger against Brawer and Ignomirello than that against Kreshik. The evidence as set out in Part I, *supra,* was more than ample to support submission of the case against them to the jury, under the *Taylor* standard, and no error was committed in the court's denial of their motions for acquittal. Ignomirello's contention that the evidence was insufficient to establish his participation in the conspiracy to sell the stolen securities lacks force when viewed in the light of his actions while accompanying Mauceli to Canada to sell the Bills. *See* United States v. Marchese, 438 F.2d 452, 455 (2d Cir.), cert. denied, 402 U.S. 1012, 91 S.Ct. 2188, 29 L.Ed.2d 435 (1971); United States v. Izzi, *supra,* 427 F.2d at 297. We hold, therefore,

that the evidence was sufficient to warrant submission to the jury, and that the trial court did not err in so doing.

## III.  THE JURY CHARGE

Each of the appellants alleges numerous errors in the jury instructions, errors which we will consider *seriatim* as follows: (1) the instructions on "knowledge" that the Bills were stolen; (2) the instructions as to the inference to be drawn from appellants' possession of the Bills; and (3) the court's failure to "tailor" the jury instructions to each appellant.

A.  *The Court's Instructions as to Knowledge*

Appellants first challenge the charge with respect to guilty knowledge;[14] criticism is directed specifically to the language which we have italicized in the note.  Appellant Kreshik argues that the challenged language is similar to that which we held defective in United States v. Fields, 466 F.2d 119, 120 (2d Cir. 1972)[15].  Brawer and Ignomirello argue further that the instruction shifted onto them the burden of proving their innocence, and that it relieved the government of its burden of proving beyond a reasonable doubt that they *actually knew*

the Bills were stolen, citing In Re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  We are not persuaded by these arguments.

■ As we recently noted in United States v. Jacobs, *supra,* 475 F.2d at 287–288, the challenged (italicized) language, which is drawn from the definition of "knowledge" found in the American Law Institute's Model Penal Code § 2.02(7) (Proposed Official Draft, 1962), has received varying degrees of approval in Leary v. United States, 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); United States v. Matalon, 425 F.2d 70 (2d Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970); United States v. Squires, 440 F.2d 859, 863 (2d Cir. 1971); and United States v. Sarantos, 455 F.2d 877, 880–882 (2d Cir. 1972).  For the reasons we gave in *Jacobs, supra,* we hold that the lower court's charge on knowledge is not defective under *Fields.*  As in *Jacobs,* the court here was careful not to rely entirely on the American Law Institute definition which, we agree, could cause problems in other situations; a careful reading of the entire charge shows that the court emphasized the element of a defendant's "deliberately clos[ing] his eyes to what otherwise would have been

14.  The trial court charged:

"It is not necessary that the government prove to a certainty that a defendant knew the bills were stolen.  *An inference of the existence of knowledge may be drawn from evidence that the defendant was aware of a high probability that the bills were stolen, unless the jury were to find that the defendant actually believed the bills were not stolen.*  In addition, the element of knowledge may be satisfied by inferences thereof to be drawn from proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him.  No person can disclaim knowledge merely by closing his eyes intentionally to facts which would otherwise have been obvious to him.  If the jury finds from all the evidence beyond a reasonable doubt that the defendant had a conscious purpose to avoid learning the source of the Treasury bills, it may infer knowledge that the bills were

stolen.  A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment will justify an inference of charging the defendant with such knowledge.  Stated another way, a defendant's knowledge of a fact may be inferred from wilful blindness to the existence of the fact."  (Tr. at 1075–76, emphasis added).

15.  The jury charge in *Fields* was as follows:

In addition, the government need not prove that the defendant actually knew that it was stolen property.  If the evidence, circumstantial or otherwise, tends to prove knowledge of the contents and also of the trailer itself being stolen, that would be sufficient.  That is only sufficient again if you apply the rule—and I will keep repeating this because it's necessary to do so—of beyond a reasonable doubt.
466 F.2d at 120.

obvious to him"; the jury could infer guilty knowledge if it found "from all the evidence beyond a reasonable doubt that the defendant had a conscious purpose to avoid learning the source of the Treasury bills"; and that "a defendant's knowledge of a fact may be inferred from wilful blindness to the existence of the fact." (Tr. at 1075–76). The charge thus differs significantly from that found defective in *Fields* since unlike the situation in *Fields,* the jurors here were made aware that they had to find either that defendants actually knew the Bills had been stolen or that defendants by their conduct demonstrated that they had deliberately shut their eyes to what they had ample reason to believe was the truth. United States v. Jacobs, *supra,* 475 F.2d at 288.

B. *The Court's Instruction as to Inferences to Be Drawn from Appellants' Possession of the Bills*

Appellants also challenge the trial Court's instruction regarding the inference of guilty knowledge which the jury could draw from the proof that each appellant possessed property recently stolen.[16] Kreshik argues that the effect of this instruction, coupled with a prior instruction permitting the jury to infer

theft of the Bills from their mysterious disappearance from the duPont vault,[17] improperly permitted the jury to convict him "on the basis of an unreasonable piling of inference upon inference". (Kreshik Brief at 18). Further, argues Kreshik, the court should have modified its "boiler plate" charge as to him, as the First Circuit ruled in Freije v. United States, 386 F.2d 408, 410–411 (1st Cir. 1967), since his possession of the Bills was explained by "other facts and circumstances consistent with innocence," *i. e.,* he was aiding an ailing parishioner who was the possessor of the Bills, Pirozzi. Brawer and Ignomirello attack the charge on the basis that the phrase "that fact alone" (referring to the "fact" of defendants' possession of recently stolen items) would lead the jury to reject *any* explanation of innocent possession that they might present.

We find no basis for appellants' arguments. The court's charge on the inference to be drawn from possession of recently stolen property is a standard instruction, based on the rule enunciated in Wilson v. United States, *supra,* 162 U.S. at 619, 16 S.Ct. 895. It was an appropriate instruction to give under the circumstances of this case

---

16. The trial court charged:
   "In addition to considering other factual circumstances on the question of the defendant's alleged guilty knowledge, if you find beyond a reasonable doubt that the defendants were in possession of securities which had been recently stolen, you may but need not infer from that fact alone that the defendants knew the securities were stolen. The rationale behind this inference is that possession of the fruits of a crime recently after its commission justifies the inference that the possession is guilty possession, and though only prima facie evidence of guilt, it may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence." (Tr. at 1076).

17. The trial court charged:
   "In connection with the government's charge that the Treasury bills in question were in fact stolen, it has presented

evidence which if you accept it indicates that the bills were received into the du Pont vaults on March 6, 1969 and were found missing about a month later. It also has presented evidence which if you accept it tends to establish that the securities didn't leave du Pont's premises in any business transaction or in any normal way, that the bills were logged into and locked in a guarded cage, that there is no record of their being removed such as would have existed under du Pont's procedure if the removal had been authorized, that a search and count negated any possibility that they had been misplaced within the confines. This unexplained disappearance, if you find that there was such, of the securities is a basis upon which you may, although you need not, draw an inference of theft. But, in any event, because this is an element of the crime, you must find beyond a reasonable doubt that the bills were stolen." (Tr. at 1072–1073).

since the Treasury Bills in question, which were issued on March 6, 1969, and delivered that same day to duPont, were found to be in the possession of appellants shortly thereafter, without meaningful proof on their part that they possessed the Bills legitimately. Not only was such proof lacking, indeed, appellants' actions with regard to the Bills gave indication that they wanted to dispose of them quickly in a foreign market —and the actions of Mauceli during his foreign travels at the behest of Brawer can hardly be termed "circumstances * * * in some way consistent with innocence," *Wilson, supra,* 162 U.S. at 619, 16 S.Ct. at 898. Kreshik's reliance on Freije v. United States, *supra,* is unwarranted since, unlike the *Freije* defendants (convicted of transporting stolen vehicles), whose evidence of "other facts and circumstances" was that they were themselves employees of an automobile sales business, and could explain their innocent possession of the vehicles on that ground, Kreshik stands on a different footing; he was not normally engaged in an occupation dealing with securities, nor did he present proof credible to the jury that his possession of the Bills shortly after their disappearance from duPont stemmed solely from his ministerial relationship to Pirozzi. The explanation given by Brawer and Ignomirello, that they believed the story provided by Kreshik and trusted the judg-

ment of the unindicted Dembe, loses force when viewed in the light of their suspicious efforts to get rid of the Bills. Under these circumstances, and absent a presentation by appellants of convincing. "circumstances * * * consistent with innocence," *Wilson, supra,* we find no error in the charge. United States v. Jacobs, supra, 475 F.2d at 280; United States v. Baum, 482 F.2d 1325 (2d Cir., 1973); United States v. Infanti, 474 F.2d 522 (2d Cir., 1973).[18]

### C. The Court's Failure to "Tailor" the Jury Instructions

■ All three appellants argue that the trial court erred in not tailoring the jury instructions as to each defendant. Kreshik specifically argues that he was prejudiced by the court's instruction on circumstantial evidence regarding the discount price for the Bills that Mauceli had offered the Canadians, since he was "lumped" with the other defendants when it was not shown that he, Kreshik, ever knew of any such discount sale price. Brawer and Ignomirello argue that the court erred in not reviewing the evidence favorable to them, which consisted of Mauceli's testimony at his *first* grand jury appearance, where he had denied under oath that Brawer had instructed him to sell to the Canadians for 65% of face value.[19] We reproduce the instruction challenged by appellants.[20]

18. We also note that appellants made no objection to this part of the jury charge and, on appeal, they must meet the "plain error" standard in order to prevail, United States v. Indiviglio, 352 F.2d 276, 280 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). We do not think that the charge constituted plain error and, therefore, we would also reject appellants' claim under *Indiviglio.*

19. As noted in our review of the evidence, Part I, *supra,* Mauceli, a co-conspirator, testified at trial that while he was in Montreal he telephoned Brawer twice to ask for instructions. In the first call Brawer allegedly told Mauceli to execute an affidavit stating that he, Mauceli, was the true owner of the Bills. In the second call, so testified Mauceli, Brawer instructed him to sell the Bills for 65%

of face value, a fact which spoke damningly of Brawer's guilty knowledge that the Bills were stolen. Brawer alleges that the court erred in not reminding the jury, during instructions, that Mauceli had denied at his first of his two grand jury appearances that Brawer had told him to sell at 65%. (Tr. at 360–361, 385–386). On cross-examination, counsel for Brawer obtained an admission from Mauceli that he had lied at his first grand jury appearance; but Mauceli also stated that he had not lied at his second grand jury appearance, nor was he lying at trial, in testifying that Brawer had in fact ordered him to sell at 65% (*id.*). See discussion of the *Brady* issue raised by appellants in Part V of this opinion.

20. "The government contends, however, that one circumstance common to all defendants, the knowledge that the bills

Kreshik challenges the instruction on the ground that the court neglected to point out that "There was no scintilla of evidence that Father Kreshik knew that the Bills were to be negotiated at considerably less than market value." (Kreshik Brief at 17). The argument is that by not reviewing the evidence against Kreshik, the court unjustly gave credence to the government's contention that "one circumstance common to all defendants [was] the knowledge that the bills were to be sold at a substantially discounted price" (Tr. at 1074), and prejudiced Kreshik by permitting as to him an inference of guilty knowledge not based on any evidence. This argument, like the similar one posed by Brawer and Ignomirello, fails upon a close reading of the instruction in its entirety, and in its relation to the other "knowledge" instructions discussed previously. The instruction is a proper statement of the law, United States v. Bletterman, 279 F.2d 320, 322 (2d Cir. 1960). The trial court explained to the jury that the inference of guilt emanating from defendant's knowledge of a substantially discounted price was permissible *only* as to any defendant which the jury found "was familiar with any unusual discount being offered to effect the sale." (Tr. at 1074). This language, rather than "lumping" all defendants, indicated to the jury that they had to discern, first, which of the defendants had knowledge of any discount price and then whether such knowledge led to "guilty knowledge" that the Bills were stolen. The court thus did "tailor" its instructions in sufficient fashion, em-

phasizing in this and other portions of its charge that each defendant had to be considered individually.[21] We find no merit in the point raised by Brawer and Ignomirello since their counsel more than adequately called to the jury's attention, on cross-examination, that Mauceli may have been lying about Brawer's alleged discount sale instruction (see Tr. at 360–61, 385–86) ; United States v. LaSorsa, 480 F.2d 522, 527–528 (2d Cir., 1973) ; and since the credibility of Mauceli was within the province of the jury, United States v. Williams, 470 F.2d 915, 917 (2d Cir. 1972).

We have given careful consideration to appellant Brawer and Ignomirello's other challenges to the jury instructions, and we find them all to be without merit.

### IV. GOVERNMENT'S EXHIBIT 17

Appellants Brawer and Ignomirello allege that the trial court erred by receiving into evidence Government Exhibit 17 since the exhibit did not constitute competent evidence due to its illegibility; further, they argue that the error of admitting the exhibit into evidence was compounded by the court's failure to explain to the jury the theory under which he was receiving it, and by the prosecutor's improper references to the exhibit in his closing statement.

Government Exhibit 17 is a sheet of stationery of the Montreal hotel where Mauceli stayed during his trip there to sell the securities. On its face appear Mauceli's handwritten notations referring to airplane flights between Montreal and New York; on its back side

---

were to be sold at a substantially discounted price, permits an inference that all the defendants knew of the stolen character of the securities. I instruct you that such an inference is permissible as applied to any defendant whom you find was familiar with any unusual discount being offered to effect the sale. In other words, sale of goods at a price considerably less than the market value may be considered as an indication of knowledge on the part of one associated with the sale that the

transaction was illegal." (Tr. at 1073–1074).

21. For example, the court reiterated to the jury that "each individual defendant is to be considered separately" (Tr. at 1046) ; and that "[t]he innocence or guilt of each defendant on trial before you must be determined separately with respect to him, solely upon the evidence presented against him or the lack of evidence against him not with respect to proof as to somebody else"; (*Id.* at 1058). *See also id.* at 1068–69.

appear arithmetical computations which have been crossed out to near illegibility by pencil marks. At trial Mauceli testified that the crossed out figures represented his computation of what his commission would be if he sold the bills at 65%; that he had made the computations after talking by telephone with Brawer, who had authorized the sale of the bills at 65% of face value; and that the paper was taken from him upon his arrest.[22] On *voir dire,* counsel for Brawer and Ignomirello established that Mauceli had not been given an inventory receipt by the arresting officers of the items taken from him, and that no date appeared on the piece of stationery. Objection was made to admitting Government Exhibit 17 on grounds that there was "no connection, it is undated." (Tr. at 581). The court received the paper into evidence, not indicating for what purpose it was being received. (Tr. at 582).

It cannot be doubted that Government Exhibit 17 was important to the government's case since it bolstered Mauceli's testimony that Brawer had authorized a sale at 65%, testimony which, if believed by the jury, would go a long way to proving Brawer's guilty knowledge that the Bills were stolen. United States v. Bletterman, *supra,* 279 F.2d at 322. As will be discussed more fully in Part V of this opinion, *infra,* appellants vigorously dispute the evidence pertaining to the 65% figure since Mauceli had changed his story with respect to the discount figure from his first grand jury appearance (where he denied Brawer had authorized the 65% discount price) to his second grand jury appearance and at trial (where he testified that Brawer had authorized the 65% sale price); and since post-trial affidavits obtained by appellants from the Canadians Bubic and Welsch categorically denied that Mauceli had ever offered to sell them the Bills at 65% or at any other discounted price.

■ Based on the facts before the trial court at the time Government Exhibit 17 was offered into evidence, we see no error in the court's admitting the paper into evidence. The exhibit was authenticated by Mauceli's testimony as well as by the admission into evidence of Government Exhibit 18, the FBI inventory receipt detailing the items taken from Mauceli at his arrest, including "Stationery of Hotel St. Bonaventure." Defense counsel did not request the trial court to limit the jury's consideration of the exhibit in any way, nor did he object to the illegibility of the notations on the back side of the hotel stationery. The court properly admitted the paper on the issue of Mauceli's credibility as to his testimony regarding the 65% sale price, and properly left the question of what weight should be given to the nearly illegible computations for jury determination.

22. The Court: You were going to say something about the reverse side?
The Witness: Yes. The reverse side was a quick notation I made after my conversations with Mr. Brawer trying to figure out what my commission would be at 65 per cent of face value.
Q. When did you make that notation?
A. That was right after I spoke to Mr. Brawer.
The Court: Where were you at the time?
The Witness: I was in the hallway of the hotel speaking on a pay telephone.
The Court: In what city?
The Witness: In Montreal in the Hotel St. Bonaventure.

The Court: What notation did you make there?
The Witness: What the commission would be at 65 per cent.
The Court: What did you put down?
The Witness: Well, it is hardly legible now, but the 65 per cent of 462,000 [sic] dollars, then 10 per cent of that and then half of that, which would be 5 per cent, which would have been my commission.
Q. Those figures are crossed over. Who crossed over those figures?
A. I crossed over those figures.
Q. This paper was taken from you later that same day by the FBI?
A. Yes, sir, it was. (Tr. at 579–80).

Brawer's criticism of the prosecutor's summation remarks as to Government Exhibit 17 presents a more troublesome question. The record shows that both the prosecuting attorney and counsel for Brawer and Ignomirello engaged in what might best be termed unnecessary and unbecoming personal accusations which have no proper place in judicial proceedings. The acrimonious exchanges related to Mauceli's crucial testimony regarding the 65% discount price: defense counsel accused the prosecutor, in effect, of fabricating the evidence as to the discount price;[23] the prosecutor in turn improperly injected his own credibility as an issue in the jury's deliberation,[24] by making the intemperate remark that "The only way you [the jury] can disbelieve that evidence [Government Exhibit 17] is if you think that I sat down this week and started writing it out. If you believe that, then you acquit without leaving the jury box."[25] As the government points

23. Counsel for Brawer and Ignomirello, in summation, made the following remarks:

"It is interesting to note where this figure sixty-five or seventy came from. It came from the party who was examining him before the grand jury, [the Assistant U. S. Attorney] Mr. Horowitz. We never heard anything more about that sixty-five or seventy percent again until later on, after Mr. Mauceli had been in and out of the U. S. Attorney's office many times. But Mr. Horowitz thought about that sixty-five or seventy percent the first time Mauceli was in before the grand jury and asked him about it, and Mauceli denied it. He said it was not true. It was ninety and eighty-five.

"So now we have a situation. Mauceli is in with Horowitz, and whatever they talked about, as Mr. Mauceli told you, related to this case. Then Mr. Mauceli goes before the grand jury again; maybe he was brainwashed; maybe something happened in there which made Mauceli feel, 'This is what I got to do to get out of this mess.'

"He told you he did not feel well, thought he was suffering from cancer and that he did not want to go to jail. But he did not care what he said, what he did or whom he hurt. All he wanted to do was make a deal.

"You remember him using the word. A couple of times I asked him about a deal and he said, 'No', but if you remember his testimony, he slipped one or two times. He himself used the word 'deal' in relation to what went on in the U. S. Attorney's office. Mauceli then went back, at any rate, before the grand jury. Now he tells the grand jury what Mr. Horowitz had asked him about the first time, the sixty-five per cent, and he tells the grand jury, 'Yes.' " (Tr. at 985–86).

24. *See* United States v. Briggs, 457 F.2d 908, 912 (2d Cir.), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972) ; United States v. Puco, (2d Cir.), 436 F.2d 761, 763 (1971).

25. The context of this remark was as follows :

"There has been some argument made about the sixty-five per cent figure and how that came about that Mauceli decided upon that figure. I suppose the prime argument is that Horowitz told him to say that figure. Well, there is no evidence of that. There is no proof of that, to begin with.

\* \* \* \* \*

"Mauceli testified that what this paper [Gov. Exh. 17] contained were some writings of his on the back which were scribbled over, and that is what it does contain, and this paper was seized by the F.B.I. Ladies and gentlemen, if you examine this, I believe you will find that the first group of numbers of two groups of numbers which are crossed out is 262 times 65. You might say this happens, that this is really, you know, Alice in Wonderland stuff. But this piece of paper was picked up by the FBI, and this is stationery from the Hotel St. Bonaventure, and it is nice to have this kind of evidence which [sic] you have a guy like Mauceli, an accomplice witness, handpicked by a guy like Brawer, who can be taken over the coals, because the only way you can disbelieve that evidence is if you think that I sat down this week and started writing it out. If you believe that, then you acquit without leaving the jury box.

"This was picked up by the FBI when he got off the plane. Poor schnooky Mauceli. He was writing those figures, and, just to make it interesting in that jury room, write out in the size that these numbers are written for the first group 262 times 65, about the size they are written · here, and see if the final numbers of that multiplication which

out at page 32 of its brief on appeal, it would indeed "have been preferable for the Assistant United States Attorney to have not injected his credibility into the case \* \* \*." While it is true that "[a]n advocate is permitted considerable latitude in replying to his opponent's arguments," United States v. Nowak, 448 F.2d 134, 141 (7th Cir. 1971), a remark such as that made here by the prosecutor is ordinarily improper since, as noted in United States v. Puco, 436 F.2d 761, 762 (2d Cir. 1971), it serves to put the prestige of the United States Attorney's office behind the government's case. Here, however, as evidenced by defense counsel's remarks, defense counsel brought this line of argument on himself and the prosecutor was entitled to respond. United States v. LaSorsa, supra, 480 F.2d at 525; United States v. Benter, 457 F.2d 1174, 1176–1177 (2d Cir. 1972). We concur fully with the observations made by Judge Oakes in Benter, 457 F.2d at 1178, and we suggest that prosecutorial remarks such as that made here be strictly avoided in the future. Viewing the summations of both the defense counsel and the government in their entirety, however, we cannot find that the latter's summation was so "extremely inflammatory and prejudicial" as to require reversal. United States v. DeAlesandro, 361 F.2d 694, 697 (2d Cir.), cert. denied 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966); United States v. Briggs, 457 F.2d 908, 912 (2d Cir.), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972).

## V. The *Brady* Issue

We turn now to the argument raised by all three appellants and based on the holding of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the Assistant United States Attorney improperly suppressed exculpatory evidence which could have been used to impeach the key government witness, Mauceli, on the important issue of whether Brawer had authorized the sale of the Treasury Bills to the Canadians at 65% of face value. The government argues that appellants never requested any exculpatory material (Gov. Brief at 33). The record, however, shows that appellant Kreshik on March 1, 1972, filed a notice of motion for pretrial discovery specifically seeking "an Order to compel the United States Attorney to turn over to defense counsel any information which tends to exculpate the defendant Wassil Kreshik." On March 10, 1972, the Assistant United States Attorney prosecuting the case, Mr. Horowitz, responded in a letter to Kreshik's counsel, stating in part:

> [T]he Government, of course, consents to furnish you with any matter exculpatory of your client which might come into possession during the pendency of this case. At the present time there is none.[26]

In its brief on appeal, however, the government notes that a post-trial examination of the files disclosed that in April, 1969, at the time the events of this case occurred, statements were taken by Canadian and United States law

---

you get when you figure it out mathematically are not the ones which you you can make out here." (Tr. at 1026–28).

26. Letter dated March 10, 1972, from Assistant United States Attorney Jay S. Horowitz to James E. Flynn, trial counsel for defendant Kreshik. The trial court denied Kreshik's motion. Brawer and Ignomirello did not make a request for exculpatory matter but they argue that, in view of the court's denial of

Kreshik's motion, it would have been futile for them to make the same request. Brawer and Ignomirello rely on our decision in United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964) for the proposition that their failure to request exculpatory material does not excuse the government's failure to disclose, especially when a request was made by one of the co-defendants on trial. Under the circumstances presented, we here consider the suppression of evidence issue as properly raised by all three appellants.

enforcement authorities from Messrs. Welsch, Bubic and Riel, regarding their dealings with Mauceli with respect to the securities in question.[27] At a later date Welsch voluntarily appeared before the grand jury and gave testimony. The April, 1969, statements were not, and to our knowledge have not yet been, made available to the defendants or to the trial court, nor have we read them. In its brief on appeal the government states, however, that none of the 1969 statements refers to discount prices of 65% or 85%, and that only the statement of Bubic refers to a sale price of 90%. (Gov.Brief at 33). At oral argument appellants submitted post-trial affidavits, dated January 16, 1973, of Bubic and Welsch, the two Canadians to whom, Mauceli testifed, the securities were offered for 65% of face value. In these affidavits the two Canadians categorically denied Mauceli's trial testimony that Mauceli had mentioned a 65% discount price to them and that he had offered his (Mauceli's) personal affidavit of ownership which, Mauceli testified, Brawer had ordered him to do. (Brawer Reply Brief at 6A, 6B). The Canadians were not called as trial witnesses by either side;[28] the government argues on appeal that appellants knew the names and addresses of the Canadians and that they themselves could have called the Canadians as witnesses, but that perhaps for purposes of trial strategy defendants chose not to call them. (Gov.Brief at 33). Greshik, however, contends that prior to hearing their names at trial, he was unaware of the existence of Bubic, Welsch, and Riel, that he had no knowledge that the Bills had been offered to them for sale, nor that the Bills had been offered to them at any discount price. It appears from the record that Brawer and Ignomirello did know of their existence, and could have called them to testify. These appellants, however, argue that they had no way of knowing Mauceli would testify at trial that Brawer had authorized a sale at 65%, and that without the April, 1969, statements of the Canadians or their grand jury testimony, both of which were denied to co-defendant Kreshik, they had no real basis for asking the trial court for a continuation in order to call the Canadians to appear and testify.[29]

We are thus presented with the troublesome question of whether the government suppressed exculpatory material which might have been of importance to the defense, since it would have

---

27. At page 33 of its Brief the government states :

"An examination of the Government's files discloses that in April, 1969, statements of Messrs. Welsch, Bubic, and Riel, as to their dealings with Mauceli, were taken by Canadian and American law enforcement officers. Welsch and Riel do not refer to the sales price of the bills, although Bubic does refer to 90% of face value, which is consistent with Mauceli's testimony as to their original understanding."

28. In his summation the Assistant United States Attorney stated to the jury that the Canadian witnesses did not appear at trial because the government did not "have subpoena power over them." (Tr. at 1021). Appellants argue that this representation was misleading, since one of the Canadians, Welsch, had appeared voluntarily at grand jury and another, Bubic, had given the Canadian authorities a statement about the events which had been turned over to the Assistant United States Attorney. Appellants argue that if the government had wanted inculpatory testimony from the Canadians at trial (if they had any to give), it would have requested them to appear as witnesses. Failure to call them, it is alleged, indicates that the prosecutor knew that their testimony would have been favorable to appellants, and would have tended to impeach the testimony of Mauceli, the key government witness.

29. While we are not persuaded by the arguments of Brawer and Ignomirello, since they easily could have called the Canadians because the latter's identity and addresses were known to those two appellants, Kreshik's arguments are more compelling, since there was no evidence that Kreshik did in fact know anything about the Canadians. Since Kreshik's claim has merit, we proceed to consider the issue as to all three appellants.

served to weaken the testimony of Mauceli on an essential issue in the government's case, *i. e.,* the offering of the Bills at great discount as a basis for imputing to all three defendants guilty knowledge that the Bills were stolen.[30] The government claims inadvertence in not disclosing to appellants the 1969 statements of the Canadians, and argues that its "arguable negligence in not disclosing these statements to the defense thus constituted neither a violation of the defendants' rights nor a violation of the prosecutor's obligations under Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963)." (Gov.Brief at 33). We are not so sure, and we cannot be sure until a hearing is held on the question whether the 1969 statements are in fact exculpatory, and whether the government improperly denied appellants access to the material. It does not suffice for the government to argue on appeal that its failure to disclose was "arguable negligence," Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 765, 766, 31 L.Ed.2d 104 (1972), for "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor," *id.*; Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). As was stated in *Giglio, supra,* "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice,'" 405 U.S. at 153, 92 S.Ct. at 766, and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears," *Napue, supra,* 360 U.S. at 269, 79 S.Ct. at 1177. *See* American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a).

█ A new trial, of course, is not automatically required simply because "a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict * * *."

United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968). The matter purportedly suppressed must first be deemed "material either to guilt or to punishment", *Brady, supra,* 373 U.S. at 87, 83 S.Ct. at 1197, and a new trial is required only if "the false testimony could * * * in any reasonable likelihood have affected the judgment of the jury," *Napue, supra,* 360 U.S. at 271, 79 S.Ct. at 1178.

█ Here, the government's case depended almost entirely on the testimony of Mauceli; with it, the jury convicted all three defendants; without it, the evidence might not have been sufficient to submit the case to the jury. Mauceli's credibility as a witness, therefore, was an important issue in the case and the 1969 statements of the Canadians might have weakened Mauceli's credibility in the minds of the jury. We therefore conclude that a hearing is necessary to determine whether the 1969 statements fit the description of "exculpatory evidence" and whether they should have been made available to defendants. This is a determination which will have to be made in the first instance by the district court. In view of the circumstances presented to us, we believe the best course to follow is to remand the case to Judge Pollack so that he, after reading and considering such material as the government may have had in its files, may determine whether this material falls into the category of exculpatory material which "in any reasonable likelihood [would] have affected the judgment of the jury", *Napue, supra,* 360 U.S. at 271, 79 S.Ct. at 1178. This panel will retain jurisdiction of the case. Upon the district court's determination of the *Brady* issue, the cause will be returned to us.

Since we have considered carefully all of appellants' various other contentions on appeal and find them to be without merit, and since we are of the opinion that, absent a finding of improper suppression of material evidence on the

---

30. See discussion of the jury instructions on this point, Part III, Section C, *supra.*

*Brady* issue, the evidence justifies affirmance of the judgments of conviction, we will await both a ruling by the district court on the *Brady* issue and the expanded record before making a final disposition of this appeal. *See* United States v. Bynum, 475 F.2d 832, 837 (2d Cir. 1973).

Remanded.